# 𝕷𝖆𝖜 𝖆𝖓𝖉 𝕰𝖖𝖚𝖎𝖙𝖞

IN THE

# SUPREME COURT

OF THE

## STATE OF NEW YORK.

---•●•---

## THE COMMERCIAL BANK OF ALBANY vs. VISSCHER TEN EYCK.

A judgment entered upon the report of a referee on a ground not presented in the pleadings or proceedings, nor taken on the trial cannot be maintained on that ground. If the plaintiffs seek to recover on such new ground they should amend their complaint, or at least disclose their intention before the trial closes.

Where a bank sued its cashier for malfeasance in surrendering eighty-two bonds for $1000, each, held by such bank, to W. who transferred them to certain brokers, receiving therefor and paying over to the bank only $70,000, by which the bank lost $14,000, it appearing that the brokers were abundantly responsible for the amount unpaid, and that no demand had ever been made upon them for such amount; *Held* that there was no such proof of *loss* or *damage*, arising from the defendant's neglect (if any) as entitled the plaintiffs to recover.

*Held,* further, that the bank should have first endeavored to collect the amount unpaid, of the brokers, by suit, before attempting to hold the defendant responsible for breach of official duty.

And tne bank, having received money arising from the sales of such bonds. and never *repudiated* the sales; *Held* that after having received the *benefit* of such sales, it must be deemed to have *adopted* the act of. the defendant in disposing of the bonds, even if he had not disposed of them in the strict line of his duty; and that it could not afterwards *disavow* the transaction.

The cashier of a bank loaned to a individual the amount of certain bonds belonging to the state, held by the bank, upon his check, to enable him to take up such bonds from the state; he promising to deposit the bonds, immediately, with the bank as security for said check, and that they should then be sold and the amount applied on the check; which was done accordingly; the cashier sending the bonds to brokers, to be sold; *Held* that in the absence of any proof that the board of directors usually did this kind of business, or had limited the cashier's powers, or undertaken to control him in managing the affairs of the bank, these acts of the cashier were to be deemed as done in the line of his duty, or in the discharge of his office of cashier, and they were therefore the acts of the bank.

The cashier sent to brokers such bonds, in a package marked "82,000 from Commercial Bank, Albany," sealed with the seal of the bank, and which had on it the name of the bank. At the same time the brokers were advised by a third person (W.) in a letter submitted to the cashier before being sent, that he had given the defendant as *cashier*, a sight draft on them for $70,000; that they might sell the bonds, and must hold the surplus, after reimbursing themselves the amount of the $70,000 draft, *subject to the order of the cashier*. The package was received by the brokers, and the $70,000 draft paid by them. *Held* that the brokers must be deemed to have known they were to account, and would be bound to account, to the bank for the surplus, and would be liable to the bank if they paid it over to W. without the order of the cashier. And that they could not therefore hold such bonds by virtue of any claims against W.

APPEAL from a judgment in favor of the plaintiffs for $19,394.70 damages and costs, entered upon the report of a referee, (Hon. Geo. Gould.) Exceptions were taken by the defendant to rulings during the course of the trial. Other exceptions were taken to findings, both of fact and of law ; and both defendant and plaintiffs appealed.

The action is for alleged malfeasance, (*not negligence*,) done by the defendant as cashier of the plaintiffs ; and the complaint sets out three causes of action. Which are as follows, viz :

1st. That the defendant surrendered to one Gilbert L. Wilson a certain bond and mortgage for $10,000, made by

Commercial Bank of Albany *v.* Ten Eyck.

John H. Reynolds, and held by the bank as collateral security ; by which the bank lost $10,000 and interest.

2d. That the defendant surrendered to said Wilson eighty-two convertible bonds of the New York Central railroad, of $1000 each, held by the bank as collateral to a debt of said Wilson, receiving therefor only $70,000, by which the bank lost $14,000 and interest.

3d. That the defendant permitted said Wilson to overdraw, in excess of his credit, $28,984.15, by which the bank lost that amount.

These causes of action are denied, and certain defenses are set up by the answer. The referee, in his report, and in his opinion, *decides in favor of the defendant on each of these three alleged causes of action.* But he finds against the defendant on *another cause of action*, which is not set up in the complaint, and was not litigated on the trial. This new cause of action is negligence in omitting to inquire of certain brokers in New York, as to bonds sent by the bank to them for sale.

The facts, as found by the referee, are mainly set forth in his report, which is as follows, to wit :

That the plaintiff is a banking association organized under the general banking law of the state of New York, passed April 18, 1838, having its place of business in Albany, and doing the ordinary business of banking, and endowed with all the powers of banking associations organized under said act and the acts amendatory thereof, and was such an association at and during the times hereinafter mentioned. That John L. Schoolcraft was president of said plaintiffs until his decease, in June, 1860, at a salary of $4000, and was its chief financial officer and responsible head ; that Ezra P. Prentice is now president of the plaintiffs, and has been, since the decease of said Schoolcraft, with no salary. That the defendant was cashier of the plaintiffs' bank from the 7th of July, 1858, to August 9, 1862, being, however, practically only head clerk, until the death of Mr. Schoolcraft. That Gilbert

L. Wilson, at the time hereinafter mentioned, was treasurer of the New York Central Railroad Company, and a director of the Merchants' Bank in the city of Albany ; that he did not keep his general bank account with. the plaintiffs, and had no pass book with the plaintiffs.   That the state of New York, at the times hereinafter mentioned, kept a large account with the plaintiffs, and received four per cent inter-. est thereon, and said account, at the times hereinafter mentioned, amounted to several hundred thousand dollars. That the state had long since loaned its stock to the Auburn and Rochester Railroad Company, and that said railroad company, having been consolidated into the New York Central Railroad Company, said last named company was legally bound to provide the means to pay that debt.   That $100,000 of such stock was payable January 1, 1861, and that the plaintiffs was the bank where the same was to be paid, being the financial agent of the state in that behalf.   That to secure the state for said stock, and as a sinking fund therefor, the state, on the 25th day of September, 1860, held ninety-two seven per cent N. Y. Central convertible bonds of $1000 each, worth in market (at least) par and accrued interest from August 1, 1860, that being the date of the last coupon paid thereon.   That on that day said Wilson represented to the defendant, that if the state should put these bonds into the market suddenly (as they might have to do in order to raise the funds to pay said $100,000 of stock,) the bonds would be depreciated, and proposed that the plaintiffs should loan him, said Wilson, the amount of said bonds, par and interest, on his check, to enable him to take up said bonds from the state, promising to deposit the bonds immediately with the bank as security for said check ; and further proposing that the bonds should then be disposed of gradually and the amount applied on said check.   That thereupon said defendant, for the bank, but without the knowledge of any other director, consented to said arrangement; and said Wilson, September 25, 1860, drew his check on the plain-

tiffs, to the order of R. Denniston, comptroller, (he being then comptroller of the state,) for $93,073.33, (the amount of said bonds and accrued interest,) and said defendant certified the same to be good, for the purpose of having the same delivered to the comptroller to procure from him said bonds, and of having the same credited to the account of the state with the plaintiffs, whenever such check should be so deposited ; and the defendant delivered the same to said Wilson, so certified, for that purpose. That said Wilson's account at that time was overdrawn. That said Wilson took said check to the comptroller and delivered the same to him, and received from him said ninety-two bonds, and immediately, within an hour's time after the certifying of the check, brought said bonds and delivered them to the plaintiffs according to said agreement. That said check was deposited on the 28th day of September, 1860, by the comptroller, in the plaintiffs' bank, to the credit of the state, and credit therefor was thereupon given to the state, of which the state has since had the benefit. That the defendant placed these bonds in the cashier's chest ; no entry of the same was made on the books of the bank, and no knowledge of the same came to any director, or any one connected with the bank, except the defendant. That within ten days thereafter, ten of these bonds were sold by the defendant or by said Wilson, or by Worcester, his assistant, for par and interest (or more,) and the avails thereof, amounting to $10,351.67, received by the plaintiffs. That about the middle of December, 1860, the defendant urged Wilson to close up the balance due on the check, and thereupon, soon afterwards, Wilson informed the defendant that he, Wilson, had made arrangements to borrow $70,000 in New York, on these bonds from Seyton & Wainwright, brokers, and that the bonds would soon be all sold by them and the value realized. That, accordingly, on the 24th of December, 1860, Wilson read to the defendant a letter, written by him to Seyton & Wainwright, of New York, (which Wilson the same day

sent, and they duly received by mail,) stating that inclosed they would find his note for $70,000 on demand, with $82,000 convertible bonds of the company as collateral, " which bonds will be forwarded to you to-day by express, by V. Ten Eyck, Esq. cashier, to whom I have given a draft, at sight, on you, for the $70,000, as arranged. You are authorized to sell any of these bonds at par and accrued interest, and your commissions, holding the avails of such sales, beyond the $70,000, subject to the order of Mr. Ten Eyck." That, thereupon, at Wilson's request, on the 25th day of December, 1860, the defendant delivered the remaining eighty-two bonds to the express company, in the city of Albany, directed to Seyton & Wainwright, of New York, in a package marked and sealed as from the Commercial Bank, but without any other instructions or directions, or notice whatever, than aforesaid; that the defendant never thereafter assumed or exercised any control over the bonds, and never, until after the death of Mr. Wilson, made any inquiry of Seyton & Wainwright about them. That the bonds were duly received by Seyton & Wainwright on the 26th day of December, 1860. That Wilson, on the day preceding that on which the defendant delivered the bonds aforesaid to the express company, had given to the defendant a sight draft on Seyton & Wainwright for $70,000, payable to him as cashier, which was duly paid by them and received by the plaintiffs, and which is all that the plaintiffs have ever received for the eighty-two bonds. That thirty-two of said bonds were sold by Seyton & Wainwright, from time to time, up to March 2, 1861, for $32,605.25, besides commissions. That they received for interest on the bonds, $2275, and that, according to directions received from Wilson, they, on the 20th day of April, 1861, delivered the remaining fifty bonds to Duncan, Sherman & Co., on receipt from them of $48,500. That, on the 26th day of December, 1860, Seyton & Wainwright paid the $70,000 draft. That, on the 8th of January, 1861, they advanced to Wilson $5150, on the

faith of other securities, promised by him to be sent to them. On the 12th of March, 1861, they paid him on his draft $833, and on the 8th of April, 1861, they, by his direction, charged against the account with these bonds in their hands, $5768.70, being the balance due them from him on another account for certain stock gambling differences, for purchases made by them for him at previous dates. That, on the 12th of June, 1861, Wilson gave to the defendant his note, indorsed by his father, John Q. Wilson, for $14,658.57, as additional collateral security for the balance due the bank on the check of $93,073.37; but no entry of this note was was made on the books of the bank, and knowledge of it came to no one connected with the bank, except the defendant, until after the death of Wilson. Nothing has been realized on it, and it is considered worthless. The defendant at no other time certified a check, and at no other time delivered a bank package to the express company. He did so on this occasion, because the clerks were not in the bank, (the day being Christmas,) and he desired to have the bonds go down, in order to protect the draft, which had been forwarded the previous day. That of the amount of the loan on this check there was due, February 1, 1861, $14,293.97, which, with interest from that date, remains due; and that said Wilson died insolvent on the 3d day of July, 1861. That, on the 4th day of January, 1860, the bank, through its president, Mr. Schoolcraft, loaned to said Wilson $14,000, and took as security therefor his note in that sum, and as collateral to its payment, an assignment of Reynolds' bond and mortgage for $10,000, which was a good security for the amount thereof. Also an assignment of seven bonds and a mortgage, of the Albany Northern Railroad Co., in the sum of $12,500. The company was insolvent, and the land mortgaged was of about the value of the amount of the mortgage, but was encumbered by a prior lien of (then) $6400. That Reynolds' bond and mortgage, and the railroad mortgage, were, with the assignment and Wilson's

note, delivered by Mr. Schoolcraft to the defendant, to be placed in the cashier's chest, without recording the assignments. The railroad bonds, for which the mortgage was security, were not delivered to the plaintiffs. Three of them, amounting, in the aggregate, to $5000, were recovered by the bank afterwards. The others, amounting to $7500, were held by other parties, under prior assignments of them by Wilson. That, about a month after receiving the above securities, the defendant was informed by Mr. Schoolcraft that Mr. Wilson could permanently "place" the Reynolds bond and mortgage, and was directed to give the same to him, that he might place it. That the defendant thereupon, without the knowledge of any one connected with the bank, except himself and Mr. Schoolcraft, delivered the Reynolds bond and mortgage and the assignment to Wilson for that purpose. That Wilson held this bond and mortgage until February 20, 1861, having meantime collected thereon $1000 of principal and $700 of interest, and appropriated the same to his own use. At the last date he sold the same to the Albany City Fire Insurance Company for $9141.53, the amount then due thereon, and received their check for this amount, and the same day delivered the said check to the defendant at the bank, without any specific direction as to its application. That the defendant, not knowing of what it was the avails, charged it in a so-called "cashier's account" on the books of the bank. Wilson afterward directed that it should be applied in part to cancel an overdraft of his at the bank, of $6690.18, and to indorse the residue on the $14,000 note. Accordingly the defendant, still ignorant of the source of the money, made the indorsement of $2451.35 on the note, under date of February 20, 1861, and afterward, between May 27 and June 12, 1862, credited the whole $9141.63 to Wilson's account, and debited the like amount on the "cashier's account," this being merely for the purpose of transferring the account, Wilson having died insolvent July, 1861. That in June, 1861, the defendant

obtained for the bank an additional collateral to the $14,000 note in Wilson's bond and mortgage, upon No. 3 Lodge street, for $5000. This was a second mortgage. That on the 2d day of May, 1862, the plaintiff received $427; on the 6th of November, 1862, $213.50; on the 15th of May, 1863, $213.50 on the note, being interest paid by Dalton & Kibbee on the railroad mortgage, and on the 2d day of June, 1862, the plaintiff realized $922.50 from the sale of Wilson's National Express stock, which was applied on the note. That the value of the interest which the bank still has in the railroad mortgage was not ascertained to the referee's satisfaction, and, in his view, it was not necessary to ascertain that value in this suit. The referee further found, as fact, that there was not any benefit to result, nor did any benefit result, to the defendant personally from any of the said transactions, nor has he had any of the money which the bank has lost in any of these transactions, either in respect to the check for $93,073.33, or to the bonds collateral thereto, or to the note of $14,000, or the Reynolds bond and mortgage; and that said Wilson was, during all these times, in public reputation, a man of unblemished integrity and of pecuniary responsibility, and one whom all his fellow citizens then esteemed.

The referee found, as matter of law, upon the foregoing facts :

1. That, in respect to the $14,000 note, the defendant was not chargeable with any act or omission by which the plaintiffs were prejudiced.

2. That, in respect to the check of $93,073.33, the defendant was guilty of no improper act in making the loan upon the security of the bonds, as he did; that the transaction was a loan upon security, and not a mere overdraft; and, further, that the defendant was guilty of no improper act in sending the bonds to Seyton & Wainwright; that he was morally certain that Wilson's letter would be sent, (as

it was, in fact ;) and, further, that the letter was abundant notice to Seyton & Wainwright, (taken in connection with the marking and sealing of the package,) that the bank had an interest in the bonds ; and, further, that the subsequent transactions of Seyton & Wainwright were not such as to give them the title of *bona fide* holders of the bonds, or of the avails thereof, and that they were liable to the bank for the value of the bonds, less the $70,000. But he further found, that the defendant was guilty of negligence in omitting, for so long a time, to inquire of Seyton & Wainwright as to the bonds, for the purpose of getting the balance due the bank on the bonds ; and that, for such negligence, the bank was entitled to recover against him for that balance. The defendant, on paying the plaintiffs, would be entitled to be subrogated to their rights against Seyton & Wainwright, and, therefore, the referee further found, that the plaintiffs should assign to the defendant the aforesaid claim against Seyton & Wainwright, and that there must be judgment that the plaintiffs recover of the defendant $14,293.97, with interest from February 1, 1861, being $4412.56, amounting, in the aggregate, to $18,706.53, for which amount the referee directed a judgment in favor of the plaintiffs, with costs.

There are some additional facts found by the referee, which appear in the case, and some others clearly established by the evidence. Among these are the following : That in August, 1861, soon after the death of Wilson, the plaintiffs had knowledge of the sale of the eighty-two bonds by Seyton & Wainwright, and of their receipt of the avails of said sales, and that they had never demanded said avails from Seyton & Wainwright.

That Seyton & Wainwright, on receiving the bonds, knew they belonged to the bank ; that they never made any advances on the faith of the bonds, except the $70,000. That no liabilities except the $70,000 were incurred by them on the credit of said bonds. That on the 20th of April, 1861, they became liable to the bank for the balance. That

when written to by the bank they did not claim to have applied the avails otherwise than on the loan ; and that Seyton & Wainwright, at the times of said transactions, were and still are brokers, in the city of New York, in good standing for integrity, and men of abundant pecuniary responsibility for the avails of said bonds.

That the defendant was not guilty of any actual bad faith, or intentional wrong, in any of the aforesaid transactions.

The defendant appealed to the general term from the judgment as entered, and the plaintiffs appealed from so much thereof as adjudged that the defendant was not chargeable with any act or omission in respect to the $14,000 note therein mentioned.

*J. H. Reynolds,* for the plaintiffs.

*L. Tremain* and *W. L. Learned,* for the defendant.

*By the Court,* HOGEBOOM, J. I. I think this judgment not maintainable on the ground taken by the referee.

(1.) Because it appears to be put upon a ground not presented in the pleadings or proceedings, nor taken on the trial, to wit : the omission of the defendant to inquire of the New York brokers as to the balance in their hands.

The complaint is for *malfeasance,* and the count adapted to the branch of the case on which the plaintiff was permitted to recover, is the second, which charges the defendant with surrendering to Wilson eighty-two bonds held by the bank for which he received only $70,000 and they lost $14,000. The proof seems to have been directed to that issue, and so far as we can reasonably infer, the case was tried on that issue. There *may* be evidence not produced bearing on this question of *omission of duty,* and if the plaintiffs sought to recover on that ground they should have amended their complaint ; or at least have disclosed their intention before the trial closed.

Assuming that the issue was properly presented, I am unable to see such proof of *loss or damage* as entitled the plaintiffs to recover. The referee proceeds on the assumption that the bank owned these bonds, and that the defendant as its agent passed them to Seyton & Wainwright by a valid transaction. If so, as Seyton & Wainwright are and always have been perfectly responsible, I do not see any *damage* which has occurred from the defendant's neglect (if it be such.) At least it seems to me, upon such strong probability of recovering the unpaid amount by suit against Seyton & Wainwright, the bank should have first endeavored to collect of Seyton & Wainwright before attempting to hold the defendant for breach of official duty.

II. It is said there is a manifest right to recover this deficit of $14,000 of the defendant on the facts as presented, and the plaintiffs should not be turned out of court because the referee may have rendered a wrong reason for a right result.

(1.) But I do not see that the case is *plain.* No doubt here is an unpaid sum of $14,000 (more or less ;) but the right to recover it of the defendant depends upon his *misappropriation* or *conversion,* or *wrongful disposition* of the bonds, and his thus putting them out of the power of the bank. This is the very point in controversy ; whether the bonds in the hands of Seyton & Wainwright were the bonds of the bank transferred or delivered to Seyton & Wainwright by the defendant as cashier in the line of his duty, or by an act which the bank has adopted and by which it is therefore bound ; or whether the defendant procured them or allowed Wilson to procure and appropriate them by an illegal and improper *overdraft,* or, having possession of them as the bank's cashier, disposed of them to Wilson so as to deprive the bank of them or of the means of recovering their amount of Seyton & Wainwright. If the latter be the indisputable inference from the facts, then (if the question of pleading were out of the way,) perhaps the judgment should be *affirmed,* notwithstanding the referee has put the right of

Commercial Bank of Albany *v.* Ten Eyck.

recovery upon a wrong ground. But if the former be the true aspect of the case, or if it be *doubtful* on the evidence which is the true state of the case, then—inasmuch as this court ought not to affirm on a different ground from that taken by the referee, except upon the most convincing proof—our true course is to reverse the judgment and grant a new trial, in order to have the facts properly found.

III. Now it is undeniable that there are several important facts tending to the conclusion that these bonds were the property of the bank, (and not Wilson's, procured through an *overdraft* ) and that Ten Eyck disposed of or delivered them to Seyton & Wainwright in the *line of his duty*, or in the due course of his *official action*, or by an act which the bank *adopted.*

(1.) Ten Eyck, it is true, allowed Wilson temporarily to *overdraw* his account $93,000. This was apparently done for not a dishonest purpose, but simply to get the bonds out of the hands of the comptroller into the hands of the bank.

But conceding this to be an act of negligence, it was immediately remedied (and within an hour) by the deposit of the bonds by Wilson in the bank. The *bonds* were then the *property* of the bank and in the *possession* of the bank. *No loss, whatever, up to this time occurred.* The bonds were equal in value to the loan to Wilson or his check. At all events, if they were *Wilson's* bonds, they were lawfully held by the bank as security for the loan, and could not be got by Wilson without paying the debt. The bank had a *special property* in them, at least.

(2.) Then about $10,000 of them were sold, either by Ten Eyck or by Wilson, (it must be presumed under the direction of the defendant or the bank,) and the proceeds paid to the bank. It would be difficult, after this, for the bank to deny that *it* held the bonds, either as its own or as having a special property in them.

(3.) The bank received $70,000 more upon these bonds by the draft on Seyton & Wainwright, or the proceeds of their

sale by Seyton & Wainwright, thus further *adopting* the act of the defendant, even if he had not disposed of them in the strict line of his duty.

It is said, I know, that all this was the act of the cashier, and that the bank did not know of these transactions till long after—after the death of Wilson, 3d July, 1861. But it got the *benefit* of these sales of the bonds, and has never *repudiated them*. And one question is, whether it can now *disavow* the transaction.

Another question is, whether Ten Eyck did not do these acts (in regard to the loan to Wilson and the disposition of these bonds to Seyton & Wainwright) in the *line of his duty*, or in the *discharge of his office* as cashier, and, therefore, whether his acts are not the acts of the bank ?.

Can we say he had not the official *right* to make the *loan* to Wilson, or to send the *bonds* to Seyton & Wainwright ? Here the question is, not whether he *ought* to have done so, but whether the bank was bound by his acts ? We have no proof that the board of directors usually did this business, or limited his powers, or undertook to control him ; or that Ten Eyck was not, (*after Schoolcraft's death*,) *in effect, the bank, making the loans and discounts*, and managing the affairs of the bank. We cannot, that I know of, presume the act to be *illegal*, though we may know or suppose there was a board of directors. Nor can we, that I know of, properly charge Wilson, or Seyton & Wainwright, with knowledge of the *illegality* or *unauthorized character* of the acts of Ten Eyck, (if they had that character.)

My impression is, that these acts were the acts of the corporation, and, at least, that they adopted them, and were, therefore, bound by them.

(4.) Then comes the transaction of sending the bonds to Seyton & Wainwright. True, Seyton & Wainwright were advised of their being sent, by a letter from Wilson, but that letter was first *submitted* to the cashier, and he (Wilson) advised Seyton & Wainwright that he had given the defend-

ant, as *cashier*, (and the proof and presumptions are abundant that they knew the cashier of the *Commercial Bank*,) a sight draft on them for $70,000,) that they might sell the bonds, and must hold the surplus, after reimbursing themselves the amount of the $70,000 draft, subject to the *order* of Ten Eyck. Accompanying this letter, or rather sent by express at the same time, was the *package of these bonds*, sent by the cashier, marked "82,000, from Commercial Bank, Albany," sealed with the seal of the bank, and which had on it the *name of the bank*. This package was received by Seyton & Wainwright, and the $70,000 draft paid. Can there be a doubt, on these facts, that Seyton & Wainwright knew they were to account, and would be bound to account to the Commercial Bank for this surplus, and would be liable to the bank if they paid over this surplus to Wilson without the order of Ten Eyck, (which was never given.) True, they undertook, afterwards, to apply this surplus to Wilson's account, 1st, to meet an account of about $5000, for which he was to provide them *other securities*, and which they advanced to him on such a promise; and 2d, to meet a deficit on some stock transactions which they claimed that he owed them. But I think this could not stand a moment against the claim of the bank, made under the circumstances above stated.

(5.) Further than this, the bank has claimed these bonds as theirs, in the complaint, and the referee has found the fact to be that they belonged to the bank.

IV. Therefore, if we assume the facts to be as found by the referee, the plaintiffs ought not to succeed on the ground taken by the referee. And if we take any *other* ground, we have not a state of facts proven with sufficient distinctness to justify an affirmance of the judgment. It seems to me, therefore, necessary to *reverse* the judgment, and award a new trial.

V. In that event, the plaintiffs desire a consideration of the question and a determination of the appeal in regard to

the liability of the defendant on the $14,000 loan to Wilson, not wishing a new trial on this ground, if, for other reasons, the judgment can be *affirmed*.

If it is to be *reversed* for reasons already given, I do not deem it necessary to determine the questions arising on the plaintiffs' appeal; for it is not claimed that a determination of these questions in favor of the plaintiffs would enable us to affirm the judgment, or prevent a new trial, if we are against the plaintiffs on the other questions in the case. Some of these questions are important, and, to some extent, perplexing, and as they are not necessary to be now decided, and the facts may be changed on a new trial, I do not enter upon their examination.

VI. Nor is it necessary to discuss the various questions of evidence, findings of fact and of law, and refusals to find, motions for nonsuit, and other questions which the defendant makes in the case.

The judgment should be reversed, and a new trial granted, with costs to abide the event.

[ALBANY GENERAL TERM, December 4, 1865.  *Hogeboom, Peckham* and *Miller*, Justices.]